

U.S. Department of Justice

United States Attorney
Eastern District of New York

WK:MEB/LHE
F. #2014R00437

271 Cadman Plaza East
Brooklyn, New York 11201

June 7, 2017

**By Hand and ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Jared Mitchell, et al.
      Criminal Docket No. 16-234 (BMC)

Dear Judge Cogan:

  The government respectfully submits this letter in response to the defendant Gerald Cocuzzo's sentencing submission, filed on June 5, 2017 ("Def. Memo."; ECF No. 282). In his sentencing submission, and in a joint loss memorandum submitted by the defendant and two other defendants on February 6, 2017 (ECF No. 124), the defendant argues for a non-custodial sentence based primarily on: (i) his personal history and characteristics; and (ii) the degree of his involvement in the offense. For the reasons set forth below, the government submits that a term of imprisonment within the advisory Guidelines range of 97-121 months, as calculated by the United States Probation Department ("Probation"), is appropriate. The defendant is scheduled to be sentenced before the Court on June 12, 2017.

I.  The Offense Conduct

  Cocuzzo is a 38 year-old resident of Delray Beach, Florida. Presentence Report dated February 10, 2017 ("PSR") at 2, ¶ 7. At the time of the charged offense conduct, Cocuzzo was employed as a broker at Newbridge Securities Corp., a broker-dealer registered with the United States Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority, Inc. ("FINRA"). Id. ¶ 7.

  ForceField Energy Inc. ("ForceField") was a Nevada corporation with its principal place of business in New York, New York. ForceField was known as SunSi Energies Inc. until the company changed its name in February 2013 as part of the company's change in focus from solar energy to Light Emitting Diode ("LED") lighting. ForceField purported to be a worldwide distributor and provider of LED lighting products and solutions, and had a class of securities registered under Section 12 of the Securities Exchange Act of 1934. ForceField's common stock

Hon. Brian M. Cogan
June 7, 2017
Page 2

was listed on the NASDAQ under the ticker symbol "FNRG."  (Indictment, ECF No. 1 ("Ind.") ¶ 10).

Adventure Overseas Holding Corporation ("AOHC") was an International Business Corporation ("IBC") formed in 2004 in Belize City, Belize.  An accountant in Belize was named in AOHC's incorporation documents as the IBC's president, secretary and sole director.  In reality, Co-Conspirator 1, a ForceField executive, controlled AOHC and its associated bank and brokerage accounts.  (Ind. ¶ 11).

Beginning in February 2015 and continuing through April 2015, the defendant joined a long-running fraudulent scheme to manipulate ForceField's stock and deceive investors.  (Ind. ¶ 22).  In or about and between December 2009 and April 2015, members of the conspiracy, including the defendant, Co-Conspirator 1, and other brokers and stock promoters, engaged in a scheme to defraud investors and potential investors in ForceField by, among other things: (a) using nominees to purchase and sell ForceField stock without disclosing this information to investors and potential investors; (b) orchestrating the trading of ForceField stock to create the appearance of genuine trading volume and interest in the stock; and (c) concealing payments to stock promoters and brokers who promoted and sold ForceField stock to investors and potential investors while purporting to be independent of the company.  (Ind. ¶ 16).

In approximately October 2014, Co-Conspirator 1 hired co-defendant Jared Mitchell and gave Mitchell money to pay a network of corrupt registered brokers (the "Corrupt Brokers"), including the defendant, in exchange for the Corrupt Brokers recommending and then purchasing ForceField stock in their clients' brokerage accounts.  Co-Conspirator 1 paid Mitchell a ten percent commission or kickback for purchases of ForceField shares generated by the Corrupt Brokers, which Mitchell then shared with the Corrupt Brokers.  Mitchell, the Corrupt Brokers (including the defendant) and Co-Conspirator 1 did not disclose to the Corrupt Brokers' clients the ten percent commission or kickbacks paid to the Corrupt Brokers for the clients' purchases of ForceField stock.  (Ind. ¶ 17; PSR ¶¶ 20-22).

In an effort to conceal the source of the kickbacks, Co-Conspirator 1 transferred funds from ForceField's bank accounts in the United States to AOHC's offshore bank accounts and often paid Mitchell through AOHC's bank accounts.  Additionally, Co-Conspirator 1, Mitchell and the Corrupt Brokers, including the defendant, used prepaid, disposable cellular telephones and encrypted, content-expiring messaging applications such as Wickr and Threema to communicate with each other.  Mitchell also attempted to conceal his kickback payments to the Corrupt Brokers by withdrawing large sums of money from his bank account and paying the Corrupt Brokers in cash.  (Ind. ¶ 18).

Between October 2014 and April 2015, in at least thirty of the instances in which Mitchell, who referred to himself as the "brown bag man," withdrew cash from his bank account, one or more of the Corrupt Brokers was in close proximity to Mitchell during or shortly after the withdrawals.  Mitchell tracked wire transfers he received from Co-Conspirator 1 and his payment of kickbacks to the Corrupt Brokers, including the defendant, in an Excel spreadsheet (the

"Kickback Accounting Spreadsheet") that he periodically sent to Co-Conspirator 1. The Kickback Accounting Spreadsheet contained: (a) the date and amount of each kickback paid to the Corrupt Brokers; (b) the date and amount of each wire transfer received by Mitchell in relation to the scheme; (c) the date and amount of each cash withdrawal Mitchell made to pay kickbacks to the Corrupt Brokers; and (d) the money Mitchell had been paid to-date by Co-Conspirator 1, the money he owed to the Corrupt Brokers and the quantity of ForceField shares purchased by the Corrupt Brokers' clients. (Ind. ¶ 19).

Between January 2015 and April 2015, the defendant purchased more than 65,000 shares of ForceField stock in brokerage accounts for at least thirteen different clients at a total cost of more than $485,000. (PSR ¶ 23). Over this time period, Mitchell communicated and coordinated with the defendant on a regular basis and paid the defendant more than $18,500 in kickbacks. (Id.) According to the Kickback Accounting Spreadsheet, Mitchell owed, but never paid, the defendant at least $15,000 in additional kickbacks for this period. (Id.)

Based on the fraudulent actions of the defendant and the co-conspirators, from approximately January 1, 2014, to April 10, 2015, alone, the price of ForceField's stock rose from a low of $4.55 per share to a high of $7.82 per share, an increase of approximately 42 percent. At its peak share price, ForceField's market capitalization was approximately $131 million. (Ind. ¶ 29).

II. Procedural History

A. The Arrest and Guilty Plea

After being indicted by a grand jury for charges including securities fraud, the defendant was arrested on May 3, 2016, at his residence in Delray Beach. PSR ¶ 34. On November 8, 2016, the defendant pled guilty pursuant to a plea agreement to Count Four of the Indictment, which charged the defendant with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff. (PSR ¶ 1).

In the plea agreement, the defendant stipulated to the government's estimate that the defendant's adjusted offense level, assuming a three-point reduction for acceptance of responsibility, would be 30, and if the defendant was in Criminal History Category I, he would have a Guidelines range of 97-121 months' imprisonment. The plea agreement also required the defendant to forfeit $18,500, and restitution in an amount determined by the Court.

B. The PSR and the Sentencing Guidelines

On February 10, 2017, Probation issued its PSR in this case. In the PSR, Probation calculated the total offense level under the Guidelines to be 30, which it calculated based on a base offense level of seven, a 20-point enhancement for an intended loss in excess of $9,500,000, a two-point enhancement for ten or more victims, a four-point enhancement for being a registered broker at the time of the offense, and a three-point reduction for acceptance of responsibility. (PSR ¶¶

Hon. Brian M. Cogan
June 7, 2017
Page 4

43-54). Probation also determined that the defendant fell within Criminal History Category I, which resulted in a Guidelines range of imprisonment for Count Four of 97-121 months. (PSR ¶¶ 56-58, 92).

With respect to loss, Probation noted that under the relevant conduct doctrine, the government found that the defendant was responsible for more than $24,806,590 in intended loss in this market manipulation case. (PSR ¶ 34, citing United States Sentencing Guideline ("U.S.S.G.") § 2B1.1, Application Note 3F(ix)). The government calculated the intended loss with respect to the defendant as $24,806,590, because ForceField had 18,107,000 shares outstanding when the defendant joined the fraud scheme on January 20, 2015, and ForceField's stock price increased by $1.37 (from $6.45 on January 20, 2015, to $7.82 on April 10, 2015) during his participation in the fraud scheme.[1]

Probation also noted in the PSR that the defendant is liable for restitution, but that the amount is still to be determined because of the hundreds of victims in the case. (PSR ¶ 102). Probation further noted that the defendant has consented to forfeiture in the amount of $18,500. (Id. ¶ 104).

III.    A Guidelines Sentence Is Appropriate in Light of 18 U.S.C. § 3553(a) Considerations

    A.    Legal Standard

In United States v. Booker, the Supreme Court held that the Guidelines are advisory and not mandatory, and the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but also may tailor the sentence in light of other statutory concerns. 125 S. Ct. 738, 743 (2005); see 18 U.S.C. § 3553(a). Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines ... to 'consider' them, along with the other factors listed in section 3553(a)." United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." Id. at 113.

---

[1] ForceField's stock price plummeted after a news article in the publication "Seeking Alpha" appeared on or about April 15, 2015, in which the author alleged ForceField had multiple undisclosed paid promoters, and that its management had connections to past fraud schemes. After public disclosure on Monday, April 20, 2015, that the chairman of ForceField had been arrested pursuant to a complaint charging him with securities fraud conspiracy, ForceField's stock price dropped precipitously, and trading was temporarily halted. After resumption of trading, the stock price declined to virtually zero.

Hon. Brian M. Cogan
June 7, 2017
Page 5

Later, in <u>Gall v. United States</u>, the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." <u>Id.</u> at 49-50 (citation and footnote omitted).

  B. <u>Application of Law</u>

As explained in greater detail below, the government respectfully submits that the Court should impose a sentence within the advisory Guidelines range of imprisonment of 97-121 months because such a sentence is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). A sentence within the advisory Guidelines will also further the aims of specific and general deterrence. <u>See id.</u> §§ 3553(a)(2)(B), (a)(2)(C).

  1. <u>Loss Under the Guidelines in Securities Fraud Cases</u>

The defendant does not dispute the loss amount calculated in the PSR, but argues that the applicable Guidelines range overstates the seriousness of the offense and that the plea agreements entered into between the government and other defendants in the scheme weigh in favor of a lower sentence here in the interest of uniformity across defendants.

  a. <u>Applicable Law</u>

Application Note 3(A) to U.S.S.G. § 2B1.1 explains that loss under § 2B1.1 is the "greater of actual loss or intended loss." Intended loss means "(I) the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (<u>e.g.</u>, as in a government sting operation, or an insurance fraud in which the claimed exceeded the insured value)." U.S.S.G. § 2B1.1, Application Note 3(A)(ii). The Second Circuit has indicated that, under this amendment, there is a rebuttable presumption that the defendant intended for his victims to lose the entire face value of the object of the fraud. <u>United States v. Jean</u>, 647 Fed. Appx. 1, 3 (2d Cir. April 22, 2016).

Application Note 3(F)(ix) to U.S.S.G. § 2B1.1, titled the "Fraudulent Inflation or Deflation in Value of Securities or Commodities," sets out a rule for use in calculating loss in securities fraud cases. Application Note 3(F)(ix) explains in pertinent part:

> In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss

>may use any method that is appropriate and practicable under the circumstances. One such method the court may consider is a method under which the actual loss attributable to the change in value of the security or commodity is the amount determined by—
>
>(I)   calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
>(II)  multiplying the difference in average price by the number of shares outstanding.

U.S.S.G. § 2B1.1, Application Note 3(F)(ix).

      b.      <u>Discussion</u>

As set forth below, the defendant's argument that the intended loss calculation should be discounted fails on the merits. First, the loss amount was appropriately calculated here. Intended loss from the scheme as a whole, which the defendant joined and actively participated in, is the appropriate loss calculation where it exceeds the actual loss calculation. U.S.S.G. § 2B1.1, Application Note 3(A). Second, the intended loss calculation used by the government here is conservative, and does not overstate the harm caused by the fraud. The government calculated the defendant's intended loss as $24,806,590, because ForceField had 18,107,000 shares outstanding when the defendant joined the fraud scheme on January 20, 2015, and ForceField's stock price increased by $1.37 cents (from $6.45 on January 20, 2015 to $7.82 on April 10, 2015) during his participation in the fraud scheme.

Notably, U.S.S.G. § 2B1.1, Application Note 3F(ix), which applies to the Fraudulent Inflation of Securities, indicates that one method a court can use to determine actual loss is the number of shares outstanding (here, 18,107,000) multiplied by the difference between the average price during the fraud scheme (here, approximately $7.45) and the average price in the 90-day period after disclosure of the fraud (here, approximately $0). By that method, the actual loss here would exceed $130 million, which would have resulted in a 24-point enhancement for loss under U.S.S.G. § 2B1.1(b)(1)(M).

Here, because it was reasonably foreseeable to the defendant that he was not the only conspirator involved in this stock manipulation scheme, the government estimated the intended loss based on the market loss caused during the defendant's participation in the scheme. The defendant is being held accountable for the amount he and the members of the scheme pushed up the price of the stock through their conduct—from $6.45 to $7.82, multiplied by the number of outstanding shares. That figure is a fair estimate of the amount of money that the scheme intended to extract from deceived investors, but does not hold the defendant responsible for the amount that

the stock price that had been increased by the manipulation scheme before the defendant's involvement. Accordingly, because the loss amount calculated here is conservative and does not overstate the harm caused by the defendant's participation in this fraud scheme, a Guidelines sentence is warranted.

The defendant also argues that he is entitled to a below-Guidelines sentence because certain of his codefendants entered into plea agreements with the government pursuant to which they pleaded guilty to different charges, and because the plea agreement entered into between the government and defendant Herschel C. Knippa III included a lower loss-estimate. The defendant is situated differently from the promoter defendants cited in his memorandum. As a registered broker, Cocuzzo and his fellow broker defendants violated the trust of their clients to a greater extent than the promoters. While Cocuzzo now claims that he believed ForceField was a "legitimate investment," this claim is not credible when, at the time Cocuzzo was selling ForceField shares to his clients, he was being paid secret cash commissions on the side by Jared Mitchell at the behest of ForceField's Chairman. Additionally, as a broker buying ForceField stock for his client accounts on the open market, Cocuzzo and his fellow broker defendants directly and significantly affected trading in the stock on a larger and more immediate scale. The calculation of intended loss is necessarily greater for the brokers, such as this defendant, who directly manipulated the price of the stock on the open market. This is because the brokers' manipulation resulted in a more significant loss to a greater number of people than the promoter defendants, who sold shares in the stock to a discrete subset of investors, often at a fixed price pursuant to the terms of share purchase agreements and other private transaction documents.

2. Nature and Circumstances of the Offense

As set forth in detail above, the defendant participated in a market manipulation scheme that artificially inflated the price of ForceField's stock, and caused serious harm to the investing public. The crime was serious. Thus, the nature and circumstances of the offense warrant a Guidelines sentence. See 18 U.S.C. §§ 3553(a)(1), (2)(A).

3. History and Characteristics of the Defendant

The defendant also argues that he deserves a non-custodial sentence because of his personal background and his history and characteristics. Specifically, the defendant characterizes imself as a hard-working employee and devoted husband and father. (Def. Mem. at 4-8).

With regard to the defendant's diligence as an employee, the defendant was productively employed as a broker at an SEC- and FINRA-registered broker-dealer at the time of the instant offense. Undoubtedly, the defendant worked as diligently in that role as he does in his current small-business lending operation. Yet, his work ethic did not dissuade him from using his employment to perpetrate crime and personally benefit financially as a result.

Hon. Brian M. Cogan
June 7, 2017
Page 8

As to the defendant's personal relationships, while he appears to be a commendable husband and father, there is nothing unique about the defendant's history and characteristics that would justify a deviation from the otherwise-applicable Guidelines. Additionally, as explained above, the defendant's conduct had a devastating financial impact on victim investors who purchased ForceField stock. Accordingly, this § 3553(a) factor does not warrant a below Guidelines sentence.

### 4. Seriousness of the Offense and Deterrence

The defendant also argues that a non-custodial sentence is appropriate here, because, he argues, that sentence complies with the factors set out in § 3553(a). (Def. Mem. at 1, 17). For the reasons explained above, this offense was serious, and caused a market capitalization loss in excess of $130 million. Moreover, the defendant and his fellow brokers used their status as brokers, and the trust their clients invested in them, to personally profit. This abuse of trust merits a significant custodial term. The defendant states that he contacted his clients once the ForceField stock started to crash in order to advise them and argues that this contact should be viewed as a mitigating factor. Mem. at 2. Assuming the defendant did try to assist his clients in avoiding losses in this manner, this conduct only resulted in his clients dumping worthless stock on other investors prior to it going down to zero. Even if his own clients' losses were in some way minimized by Cocuzzo advising them to sell, those clients likely would not have purchased the stock in the first place if he had not sold it to them as part of his corrupt scheme. Moreover, his conduct in manipulating and inflating the stock price still caused significant, wholly unmitigated harm to all other investors.

The Court's sentence should also further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C). There is a greater need for general deterrence for fraud schemes than other crimes, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

A sentence within the applicable Guidelines range is warranted in the interest of deterrence, both specifically to this defendant and generally to the financial services industry.

Hon. Brian M. Cogan
June 7, 2017
Page 9

IV.    Conclusion

Based on the foregoing, the government respectfully requests that the Court impose a term of imprisonment within the advisory Guidelines range of 97-121 months.

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York

By:     /s/
Mark E. Bini
Lauren H. Elbert
Assistant U.S. Attorney
(718) 254-8761

Cc:    Clerk of the Court (BMC) (By ECF)
       Elizabeth Macedonio, Esq. (By ECF and Email)